UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

**TRENT NEVILL**
**5016 MANCHESTER ROAD**
**HIGHLAND VILLAGE, TX 75077,**

    **Plaintiff,**

    Case No._____

 v.

**JOHNSON CONTROLS**
**INTERNATIONAL PLC**
**ONE ALBERT QUAY**
**CORK, IRELAND**

    **Defendant.**

# COMPLAINT

Plaintiff Trent Nevill, by his attorneys Davis & Kuelthau, s.c., alleges as follows against Defendant Johnson Controls International PLC:

## INTRODUCTION

1. Trent Nevill was a long tenured employee of Johnson Controls, Inc. ("JCI"). He was valued by JCI's executives and board members for his loyalty and unbridled commitment to JCI's vision of international growth and global business development. To this end, Mr. Nevill was appointed in April 2016 as the President of JCI's Asia Pacific region. However, following JCI's merger with Tyco International, new management significantly de-emphasized JCI's Asia Pacific strategy and restructured operations in the area. As a result, it changed Mr. Nevill's position and changed and diminished his pre-merger duties, responsibilities, authority, and reporting relationships.

2. Mr. Nevill now files this federal action against his post-merger employer, the newly formed foreign business Johnson Controls International PLC (hereinafter referred to as "JC International" or the "Company") to obtain a ruling from this Court that Mr. Nevill had Good Reason to terminate his employment with JC International under the terms of his Change of Control Agreement and is therefore entitled to his pay and benefits under that Agreement.

## PARTIES

3. Mr. Nevill is an adult resident of the State of Texas, currently residing at 5016 Manchester Road, Highland Village, Texas 75077.

4. JC International is a foreign corporation existing under the laws of the Country of Ireland, with the address for its principal executive office located at One Albert Quay in Cork, Ireland. JC International is registered with the Wisconsin Department of Financial Institutions and, through that entity, has identified its Registered Agent in this state as CT Corporation System, located at 301 S. Bedford Street, Suite 1, Madison, Wisconsin 53703.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds the statutory requirements.

6. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because the defendant maintains a principal office within, and a substantial part of the events giving rise to Mr. Nevill's claims, occurred in this judicial district.

## GOVERNING LAW

7. Mr. Nevill brings this action pursuant to his "Johnson Controls, Inc. Change of Control Executive Employment Agreement," alleging claims based on his rights and interests

created by this agreement. This agreement specifies that it "shall be governed by and construed in accordance with the laws of the State of Wisconsin, without reference to principles of conflict of laws." Wisconsin law governs the claims asserted in this action.

## FACTS

**Mr. Nevill's employment history with JCI.**

8. For the past 22 years, Mr. Nevill has been an employee of JCI, or its affiliated companies (including JC International). Other than a brief stint away from 2000-2002, Mr. Nevill has spent nearly his entire professional life with Johnson Controls.

9. JCI produced automotive parts such as batteries, and electronics and HVAC equipment for buildings.

10. During his employment with JCI and then JC International, Mr. Nevill held various positions at various locations across the nation and around the world, including Wisconsin, Texas, and China.

11. Mr. Nevill became a highly valued member of JCI and quickly moved up in the company, including his appointment in 2014 as Vice President and General Manager, Systems and Services North America, which was a division of JCI's Building Efficiency business unit. The Building Efficiency business unit designs, produces, installs and services heating, ventilation and air conditioning systems, industrial refrigeration, building management systems, fire and security systems for commercial and residential buildings. In that role, Mr. Nevill was responsible for a $4.5 billion business reporting segment for JCI.

**Mr. Nevill's appointment as President of APAC.**

12. In February 2016, JCI's then Chief Executive Officer, Alex Molinaroli, and Chief Human Resources Officer, Simon Davis, recruited Mr. Nevill for a newly-formed position of

President of Asia Pacific (APAC). JCI's leadership team recognized the huge growth potential in the APAC region, and developed the Presidency position for Mr. Nevill so he could develop JCI's business through effective government relations, business connections, strategic planning, investments, and capability building in the region.

13. The APAC Presidency position was a unique and prestigious position within JCI, and came with very specific job duties, responsibilities, and reporting requirements. To this later point, the position was one of only a few that reported directly to the JCI's CEO, Alex Molinaroli.

14. Mr. Nevill met with Mr. Molinaroli and Mr. Davis on several occasions to discuss the APAC Presidency position. During those meetings, the company's leaders explained the position in detail to Mr. Nevill and provided company documents that described the APAC President's role, job functions, and direct reports.

15. Among other things, Mr. Molinaroli and Mr. Davis provided Mr. Nevill with a chart that described the reporting requirements and relationships of the various roles involved in completing tasks or deliverables for the APAC region. The chart identified tasks which Mr. Nevill would be Responsible for, Accountable for, would lend Support to, or be Informed of and Consulted on (the "RASIC Chart").

16. Mr. Molinaroli and Mr. Davis also provided Mr. Nevill with a written description of the position of President of APAC (the "Position Brief").

17. The Position Brief described the APAC Presidency position as:

> [A] critical leadership role responsible for strategic business growth, enterprise leadership and functional management for JCI in the region. As a member of the Executive Operating Team (EOT) this individual will ultimately define and deliver the strategic roadmap for APAC driving fast paced growth and market leadership for all of JCI's businesses. President—Asia Pacific will collaborate with Business Unit (BU) leadership in the region to target and achieve both organic and inorganic growth across all market segments. This role will have direct responsibility for managing APAC based corporate and functional leadership resources.

18. The Position Brief explained that the President of APAC was to be responsible for, among other things: (1) overseeing JCI's then-existing business units in the region (Buildings Efficiency, Automotive Experience, and Power Solutions); (2) APAC strategic planning; (3) APAC corporate development; (4) APAC corporate functional leadership; (5) APAC shared services; (6) APAC product management; (7) approval of capital appropriation requests in APAC; and (8) APAC government relations.

19. The APAC President was also tasked with building and overseeing regional corporate functions to be localized at JCI's newly created second world headquarters in Shanghai, China, including corporate functions such as Human Resources, Finance, Legal, Strategy, Corporate Development, Government Relations, Purchasing, Communications, IT, and Compliance.

20. In sum, the APAC President was to be responsible for running and growing JCI's APAC business, as a separate and independently functioning unit from JCI's domestic operations.

21. Mr. Nevill accepted the position as President of APAC in accordance with a written employment agreement and a March 17, 2016 letter which defined the benefits for the new position. Mr. Nevill moved to Shanghai, China in April 2016.

22. Between April 2016 and September 2016, Mr. Nevill devoted 100% of his time and efforts as a JCI employee to his duties as APAC President. Mr. Nevill routinely worked 60-70 hours per week in his new position, and remained in regular contact with JCI CEO, Mr. Molinaroli.

23. Mr. Nevill wholly supported Mr. Molinaroli and JCI's global growth strategy, and embraced its investment in building and organically growing the company's worldwide presence, including throughout the key APAC region.

**The Tyco merger and Change of Control Agreements.**

24. In September 2016, JCI and Tyco International ("Tyco") merged (hereinafter referred to as the "Tyco Merger"). The Tyco Merger resulted in the creation of JC International, a foreign company incorporated in Ireland and formed for the purpose of taking advantage of the lower corporate tax rates in Ireland.

25. Prior to the Tyco Merger, JCI entered into a "Change of Control Executive Employment Agreement" ("Change of Control Agreement" or "Agreement") with Mr. Nevill and similar such agreements with several other key company executives. A true and correct copy of Mr. Nevill's Change in Control Agreement is attached hereto as Exhibit A.

26. The Change of Control Agreements served an important function for JCI. JCI wanted to ensure that the company's key executives continued their employment with the company and followed through with implementing the company's overall growth and strategy initiatives following the Tyco merger.

27. To accomplish their objectives, the Change of Control Agreements included terms that ensured that each executive who entered into an Agreement would maintain his or her pre-merger position, authority, duties, responsibilities, and salary.

28. Section 3(a) of the Agreement provides:

> <u>Terms of Employment</u>. (a) <u>Position and Duties</u>. (i) During the Employment Period, (A) the Executive's position (including status, offices, titles and reporting requirements), authority, duties and responsibilities shall be at least commensurate in all material respects with the most significant of those held, exercised and assigned at any time during the 90-day period immediately preceding the Effective Date and (B) the Executive's services shall be performed at the location where the Executive was employed immediately preceding the Effective Date or any office or location less than 35 miles from such location.

29. In the event the company changed or diminished the executive's pre-merger role, the executive could resign employment for Good Reason and would be entitled to certain benefits.

30. Upon information and belief, Mr. Nevill's Change of Control Agreement is the same or substantially similar to other JCI executives.

31. The Change of Control Agreement entitles Mr. Nevill to certain pay and benefits if he resigns his employment with JC International for "Good Reason" within the Employment Period defined by the Agreement. "Good Reason" under section 4(d) of the Agreement includes the occurrence of:

> the assignment to the Executive of any duties inconsistent in any respect with the Executive's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities as contemplated by Section 3(a) of this Agreement, or any other action by the Company which results in a diminution in such position, authority, duties or responsibilities, excluding for this purpose an isolated . . .

32. Section 4(d)(vi) of the Agreement provides that "any good faith determination of 'Good Reason' made by the Executive shall be conclusive."

33. Section 5(a) of the Agreement describes the Company's obligations to provide certain benefits to Mr. Nevill if his employment is terminated for Good Reason, including the

obligation to pay a Special Termination Amount (as defined therein) and to continue certain welfare benefits and provide other benefits.

34. Pursuant to Section 7 of the Agreement, JC International is obligated to pay Mr. Nevill's legal fees associated with any dispute or claim concerning his entitlement to benefits under the Agreement.

35. Section 7 of the Agreement states as follows:

> The Company agrees to pay, to the full extent permitted by law, all legal fees and expenses which the Executive may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, the Executive or others of the validity or enforceability of, of liability under, any provision of this Agreement or any guarantee of performance thereof (including as a result of any contest by the Executive about the amount of any payment pursuant to this Agreement), plus in case interest on any delayed payment at the Prime Rate, compounded quarterly. The Company shall make such payment to the Executive within thirty (30) business days (but in no event later than the end of the calendar year following the calendar year in which the Executive incurred such fees and expenses) following receipt from the Executive of documentation substantiating such fees and expenses.

**JC International changed Mr. Nevill's position following the Tyco Merger**

36. JC International changed Mr. Nevill's title and position following the Tyco Merger.

37. JC International's 2016 Annual Report (10-K) filed with the United States Securities and Exchange Commission identified Mr. Nevill's new, changed position.

38. In its 2016 Annual Report, JC International disclosed to its shareholders and prospective investors that Mr. Nevill "was elected Vice President and President, Building Solutions, Asia Pacific following the completion of the Merger in September 2016. Prior to the Merger, he was a Vice President and named President, Asia Pacific of Johnson Controls, Inc."

39. Mr. Nevill's pre and post Tyco Merger positions are different. The position of President, *Building Solutions*, Asia Pacific refers to a role of a reporting segment within the Asia Pacific region and is a lesser role than President of Asia Pacific, which is responsible for the entire region.

40. In addition to Mr. Nevill, JC International's 2016 Annual Report also identified other JC International executives who were "elected to" or assigned new positions following the Tyco Merger.

41. The 2016 Annual Report reported that William Jackson, who pre-merger was the Vice President and named President, Building Efficiency of Johnson Controls, Inc., was "elected Vice President and President, Global Products, Building Technologies and Solutions following the completion of the Merger in September 2016."

42. JC International also circulated a press release following the Tyco Merger, wherein the Company announced its new "Building Technologies & Solutions leadership team."

43. That announcement identified William Jackson's new position and also disclosed Mr. Nevill's changed position following the Tyco Merger, specifying that post-merger, Mr. Nevill is to "assume P&L responsibility for Building Solutions Asia Pacific, which will include current Building Efficiency Systems and Services branches and Tyco Integrated Solutions & Services offices."

44. The Company's directive that Mr. Nevill "assume P&L responsibility for Building Solutions" in APAC meant he was would be responsible for the daily profits and losses of that regional reporting segment.

**Mr. Nevill's new P&L responsibilities for a regional reporting segment were inconsistent with his pre-merger duties and responsibilities.**

45. Mr. Nevill's newly assigned P&L responsibilities for the Company's Building Solutions segment were wholly inconsistent with, and diminished his role as, President of APAC.

46. Instead of being responsible for JC International's overall strategy in the APAC region as APAC President, and devoting his time to organically growing JC International's business and relationships in that region, Mr. Nevill was forced to devote approximately 70% of his time to the new P&L Buildings Solution role.

47. The new role sometimes meant that Mr. Nevill was required to devote 24 hours a day (due to time zone differences) to his new P&L Building Solutions role, which included handling daily cash calls, forecasting secured orders, revenues, and segment income, and monitoring inventory and accounts receivable for the regional Building Solutions segment.

48. Mr. Nevill ultimately went from being tasked with having authority and responsibility for building JCI's APAC business, to simply supervising and ensuring daily revenues for one regional business segment. The two positions are inherently contrary to one another.

**JC International changed and diminished Mr. Nevill's pre-merger roles following the Tyco Merger.**

49. In addition to JC International assigning Mr. Nevill an entirely new position following the Tyco Merger, JC International also changed and diminished Mr. Nevill's pre-merger position, authority, duties, and responsibilities.

50. Mr. Nevill was no longer supervising regional corporate functions in APAC; instead, JCI immediately moved the legal corporate function to its Milwaukee headquarters and, over the coming months, hired and appropriated several new employees to lead information

technology, financial shared services, government relations and communications globally, thus impacting Mr. Nevill's pre-merger RASIC relationships and responsibilities. This was all done without Mr. Nevill's input.

51. As President of APAC, Mr. Nevill was asked to present APAC growth and strategy at the company's board meetings and to investment analysts. Following the merger, JC International took a clear step away from legacy JCI's Asia Pacific growth strategy, and as a result, Mr. Nevill was not asked to did not present the Company's APAC initiatives and progress to the Board or Analysts after December 2017.

**Mr. Nevill's reporting relationships changed following the Tyco Merger.**

52. JC International's new role for Mr. Nevill, and clear change in direction in the APAC region, also diminished Mr. Nevill's reporting requirements. William Jackson was inserted as the head of Global Strategy, which came with clear authority over, and usurped, Mr. Nevill's pre-merger APAC position.

53. Mr. Nevill's monthly direct reports to Mr. Molinaroli were also changed or diminished.

54. As President of APAC, Mr. Nevill was to directly report to the Company's CEO, which was Mr. Molinaroli, who held that position until September 1, 2017.

55. However, immediately following the Tyco Merger in September 2016, Mr. Nevill was required to report to the then-Chief Operating Officer (COO), George Oliver.

56. The Company has confirmed in recent Proxy Statements, that changes in reporting requirements were sufficient to trigger an executive's Change of Control Agreement, including, for example, Brian Stief, the Company's Executive Vice President and CFO.

**Complaint** Page 11 of 16
Case 2:18-cv-00986-PP   Filed 06/27/18   Page 11 of 16   Document 1

**JC International has conceded fellow executives were entitled to benefits under their Change in Control agreements.**

57. By letter dated March 31, 2016, JCI agreed that the Tyco Merger constituted a Change of Control, entitling Mr. Nevill to the benefits and protection of the Change of Control Agreement.

58. Upon information and belief, JCI sent similar letters to similarly-situated JCI executives, acknowledging a change in control occurred, entitling them to the benefits and protection of the Change in Control agreements.

59. As set forth above, in the Agreement, the Company agreed that Mr. Nevill would be entitled to retain the same position, authority, duties and responsibilities as they existed pre-merger despite the change in control. Further, the Company agreed that if Mr. Nevill's position, authority, duties or responsibilities changed or were diminished and he resigned his employment for Good Reason, he was entitled to certain benefits under Section 5(a) of the Agreement.

60. In JC International's 2018 Proxy Statement, the Company confirmed that Mr. Jackson's Change of Control Agreement has been triggered and he had Good Reason to terminate employment following the Tyco Merger because his reporting relationships and responsibilities changed.

61. That Proxy Statement provides that:

> As a result of the integration of legacy Johnson Controls, Inc. and legacy Tyco, including changes in reporting relationships and responsibilities, the Company believes that Mr. Jackson has the ability to trigger a "good reason" resignation at any time prior to September 2019 and receive the benefits described above.

62. JCI also conceded that Mr. Molinaroli's Change of Control Agreement was triggered, and that he was entitled to the benefits and pay to which he was entitled under the Agreement.

63. Upon information and belief, the Company has conceded that several other executives are entitled to benefits under their Change of Control Agreements with JC International because of changes in their position, authority, duties or responsibilities, requiring the Company to make payments to those executives.

64. In light of the Change of Control benefits the Company has been obligated to pay to legacy JCI executives, JC International has publicly acknowledged, and discussed internally with its Board of Directors Compensation Committee, its displeasure with the Change of Control Agreements entered into with legacy JCI executives, implying the Company's intent to challenge its obligation to pay future benefits to executives like Mr. Nevill.

**Mr. Nevill's resignation and JC International's unlawful withholding of benefits.**

65. On multiple occasions over the course of months, Mr. Nevill expressed to JC International CEO George Oliver his concerns about his changing position and role with the Company following the Tyco Merger.

66. Although Mr. Oliver never substantively addressed or remedied Mr. Nevill's concerns, Mr. Nevill continued performing his duties and responsibilities for the Company, spending most of his time addressing his post-merger P&L responsibilities for the regional Building Solutions segment.

67. Ultimately, taking into account all of the facts and circumstances, Mr. Nevill determined in good faith that he had Good Reason to resign his employment with JC International under the Change of Control Agreement. Mr. Nevill made that determination because, among other things, 1) his post-merger position changed; 2) his reporting relationships changed; 3) he was assigned duties inconsistent with his pre-merger APAC Presidency position

and associated authority, duties, and responsibilities; and 4) his pre-merger authority, duties and responsibilities were diminished.

68. Pursuant to the terms of the Agreement, Mr. Nevill's good faith determination that he had Good Reason to terminate his employment is conclusive.

69. Mr. Nevill tendered his resignation to JC International, and ceased employment with the Company as of May 7, 2018.

70. Mr. Nevill has explained the grounds for his Good Reason resignation to JC International and demanded all sums and benefits due and owing under the Change of Control Agreement.

71. To date, JC International has failed to acknowledge that Mr. Nevill's resignation was for Good Reason and that he is entitled to benefits under the Change of Control Agreement for a Good Reason resignation. JC International has unlawfully withheld all sums and benefits Mr. Nevill is entitled to under that Agreement.

## **CLAIM FOR BREACH OF CHANGE OF CONTROL AGREEMENT**

72. Mr. Nevill entered into a Change of Control Agreement with JCI.

73. JC International assumed the Change of Control Agreement in accordance with the Merger Agreement.

74. JC International agreed that Mr. Nevill's position, authority, duties and responsibilities would not change post-merger. JC International changed per Nevill's position, authority, duties and responsibilities post-merger.

75. Pursuant to the terms of the Change of Control Agreement, JC International is required to pay Mr. Nevill certain benefits in the event of a Good Reason resignation.

76. Pursuant to the terms of the Change of Control Agreement, Mr. Nevill made a conclusive and good faith determination that he had Good Reason to terminate his employment based on his post-merger position change, post-merger assignment of duties inconsistent with his pre-merger APAC Presidency position and associated authority, duties, and responsibilities, and the diminution in his pre-merger authority, duties and responsibilities.

77. JC International has breached the terms of the Change of Control Agreement by failing to acknowledge that Mr. Nevill terminated his employment for Good Reason and for failing to pay Mr. Nevill the sums and benefits to which he is entitled under the Agreement.

78. JC Internationals' breaches of the Agreement are material.

79. Mr. Nevill has been damaged by JC International's material breaches of the Change of Control Agreement in an amount to be determined at trial, currently estimated to be in excess of $5 million.

## CLAIM FOR LEGAL FEES AND EXPENSES

80. Pursuant to the terms of the Change of Control Agreement, JC International agreed to pay all of Mr. Nevill's "legal fees and expenses" that he reasonably incurred as a result of "any contest, (regardless of the outcome thereof) by the Company, the Executive or others of the validity or enforceability of, or liability under, any provision" of the Agreement.

81. Mr. Nevill has asserted a reasonable claim for sums and benefits owed to him under the Change of Control Agreement.

82. JC International is responsible for paying Mr. Nevill's "legal fees and expenses" incurred by Mr. Nevill related to this dispute and legal action.

**WHEREFORE**, Plaintiff Trent Nevill prays for judgment in his favor and against Defendant Johnson Controls International PLC, as follows:

a)  An Order that Mr. Nevill's resignation of his employment was for Good Reason; entitling him to the compensation and benefits set forth in paragraph 5(a) of the Agreement;

b)  An award of damages against Defendant Johnson Controls International PLC for its breach of the Change of Control Agreement;

a)  An award to Mr. Nevill of his legal fees and expenses to which he is entitled under the Change of Control Agreement; and

b)  An award to Mr. Nevill of such other relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable to a jury in this action.

Dated: June 27, 2018.	**DAVIS & KUELTHAU, S.C.**

By: *s/ Susan G. Schellinger*
Susan G. Schellinger, SBN 1021147
Ryan M. Wiesner, SBN 1090647
111 E. Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202
Tel. (414) 276-0200
Fax (414) 276-9369
Email  sschellinger@dkattorneys.com
          rwiesner@dkattorneys.com

*Attorneys for Plaintiff Trent Nevill*