TRENT NEVILL,

        Plaintiff,

  v.                             Case No. 18-cv-986-pp

JOHNSON CONTROLS INTERNATIONAL PLC,

        Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO STAY (DKT. NO. 9)
AND GRANTING DEFENDANT'S ALTERNATIVE MOTION TO DISMISS
IN FAVOR OF ABITRATION (DKT. NO. 9)**

---

Trent Nevill filed a complaint seeking to recover money and benefits from Johnson Controls International (JCI) under a Change of Control Executive Employment Agreement. That agreement provided for a lump sum payment if the plaintiff resigned for "Good Reason." The plaintiff believed he had "Good Reason" for resigning, because the defendant reduced his responsibilities following the September 2016 merger between Johnson Controls and the Irish company Tyco; the defendant disagreed and has not paid the termination payment. The defendant has moved to stay the case pending arbitration, or in the alternative, to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), arguing that agreements between the plaintiff and the defendant require that the case be resolved through arbitration. The court concludes that the agreements requiring arbitration govern, and it will grant the defendant's motion to dismiss under Rule 12(b)(3).

## I. FACTS

The plaintiff worked for the defendant and its affiliated companies for twenty-two years. Dkt. No. 12 at ¶2. By 2014, the plaintiff held the title Vice President and General Manager of Systems and Services North America, and was running a $4.5 billion segment of the company. Id. at ¶3.

### A. *Contractual Terms of Equity Awards or Grants*

As the plaintiff advanced, the defendant increasingly compensated him in the form of equity awards or grants, which it issued subject to broad arbitration provisions. Dkt. No. 10-1 at ¶¶4–5, 7, 10. The 2012 Plan governing these "shares and incentives" explains that the programs had several purposes: recruiting and retaining directors and employees, giving them incentive to achieve short and long-term performance goals, providing them opportunities to participate in the defendant's growth and success, and aligning their interests with shareholders. Dkt. No. 10-4 at 2. The defendant's awards and incentives manager stated in her declaration that between November 14, 2000 (when the plaintiff was offered his first grant) and January 14, 2018 (when he accepted the last one), the plaintiff received thirty-three awards and grants. Dkt. No. 10-1 at ¶7. She averred that under the defendant's stock price as of August 22, 2018, "the total current value of [the plaintiff's] 33 equity awards and grants (if he had held them until August 22, 2018) would be over $6 million." Id. at ¶10. The defendant granted seventeen of the awards under its two most recent incentive plans; these seventeen awards either were "outstanding" or "unvested" as of the date the plaintiff resigned. Id. at ¶8. The

manager attested that the plaintiff's unvested equity as of August 22, 2018 was more than $4.5 million. Id. at ¶10.

    B.    *Documents Governing Awards or Grants*

The defendant's rewards and incentives manager averred that for over ten years, every award or grant of equity has been governed by two "complementary" documents: (a) a plan that applied to all equity awards that the defendant issued during a particular period, and (b) an individual agreement governing the specific grant or award. Id. at ¶11. She attested that between January 24, 2007 and September 25, 2012, the master plan was called the 2007 Stock Option Plan ("2007 Plan"). Id. at ¶12. From September 25, 2012 through September 2, 2016, the master plan was called the 2012 Omnibus Incentive Plan ("2012 Plan"). Id. at ¶13. On September 2, 2016— about the same time that the merger with Tyco was finalized, the defendant adopted, and amended, Tyco's plan ("2016 Plan"). Id. at ¶14. The defendant attached to the brief in support of its motion to stay or dismiss a compilation of the individual agreements for each of the plaintiff's awards. Dkt. No. 10-5.

The 2012 Plan said it was governed by Wisconsin law. Dkt. No. 10-3 at ¶19(h). It included the following clause:

> Notwithstanding anything to the contrary herein, if any individual (other than the Company) brings a claim involving the Company or an Affiliate, regardless of the basis of the claim (including but not limited to claims relating to wrongful discharge, Title VII discrimination, the Participant's employment or service with the Company or its Affiliates or the termination thereof, benefits under this Plan or other matters), such claim shall be settled by final binding arbitration in accordance with the rules of the American Arbitration Association ("AAA") . . . .

3

Id. The 2016 Plan contained an almost identical provision:

> [I]f any individual (other than the Company) brings a claim
> involving the Company or a Subsidiary, regardless of the basis of
> the claim (including but not limited to claims relating to wrongful
> discharge, Title VII discrimination, the Participant's employment or
> service with the Company or its Subsidiaries or the termination
> thereof, benefits under this Plan or other matters), such claim
> shall be settled by final binding arbitration in accordance with the
> rules of the American Arbitration Association ("AAA") . . . .

Dkt. No. 10-4 at ¶7.16. The specific agreements for the individual awards or

grants also contained arbitration agreements. See, e.g., Dkt. No. 10-5 at p. 5,

¶15; p. 9, ¶15; p. 16, ¶11 ("Arbitration will be conducted per the provisions in

the Plan"); p. 22, ¶11; p. 26, ¶15; p. 32, ¶11; p. 37, ¶11; p. 45, ¶11.

C.    *The Plaintiff Was Offered, and Accepted, Awards and Grants*

The defendant's rewards and incentives manager attested that between

October 2009 and March 2015, the defendant used an "online interface"

system called Benefit Access, managed by Morgan Stanley, to allow

participants to "review, accept, and track" equity awards and grants. Dkt. No.

10-1 at ¶16-17. In March 2015, Morgan Stanley switched to a similar system,

this one called StockPlan Connect. Id. at ¶17.

From October 2009 to March 2015, the defendant required participants

to follow a specific, step-by-step process to accept the award using Benefit

Access. First, the participant received an email from human resources or the

participant's manager, notifying him that he had been offered a grant or award.

Id. at ¶18. A few days later, the participant would get a second email from the

Shareholder Services Department, telling him that he could review the terms

and conditions, and accept the award, only by logging into his Benefit Access

account. Id. at ¶19. This second email provided "Step By Step Grant

Acceptance Instructions," including a requirement that the participant review

the terms of the grant, "including all documents pertaining to the grant." Id.

Once the participant logged in, Benefit Access alerted the participant that there

was a grant or an award waiting to be accepted. Id. at ¶¶20-21. When a

participant clicked on a grant or award that he wanted to accept, the

participant was "navigated . . . to the next page in the acceptance process." Id.

at ¶22.

The defendant provided screen shots of the Benefit Access website; the

section labeled "B. Read and Acknowledge Grant Documents" displayed

hyperlinks to documents and agreements participants had to open before they

could accept or reject the award or grant. Id. at ¶24. A red-shaded box with an

exclamation point in it appeared below the words "Read & Acknowledge Grant

Documents;" the text in the box stated, "You must select the checkbox to

indicate you have read all associated documents before you can proceed." Id. at

¶22. The checkbox referred to in the red-shaded area "was accompanied by the

statement 'I have read all the documents below' and appeared above the space

where plan and award agreements were listed, alongside hyperlinks used to

open them." Id. at ¶26. The system would not allow a participant to click the

checkbox until he actually had opened the hyperlinked documents (such as the

applicable plan and related documentation for the individual award or grant).

Id. So, for example, in December 2014, the plaintiff accepted award number

S108; when he clicked the hyperlinks, they would have opened a complete copy

of the 2012 Plan as the "Plan Document" and a complete copy of the grant-specific agreement listed as the "Stock Option /SAR Agreement." Id. at ¶25.

After the participant had opened the relevant documents, and clicked the verification that he had read them, the participant had to enter an individual password, which operated as an electronic signature. Id. at ¶¶27, 28. Only then could the participant click on either an "accept" or "reject" option; "[i]t was mechanically impossible to accept or reject a grant or award without opening the relevant plan and individual award or grant agreement and attesting to having read them." Id. at ¶28.

According to the defendant's awards and incentives manager, the plaintiff used the Benefit Access system to accept one of the seventeen outstanding or unvested awards. Id. at ¶¶8, 42.

From March 17, 2015 to December 31, 2017, when the StockPlan Connect Online System was in use, the process was similar. Id. at ¶29. The participant received an email notifying him of a pending grant or award, giving him instructions about how to learn more and advising him that another email would be coming with specific instructions on how to accept or reject the grant or award. Id. at ¶29. The second email provided the step-by-step instructions. Id. at ¶30. The participant then logged in to StockPlan Connect, and saw a pop-up box listing grants or awards that were "pending disposition." Id. at ¶32. Once the participant clicked "accept" next to a pending award or grant, he was routed to a "Grant Acceptance" page. Id. Again, this page had a "Read and Acknowledge Grant Documents" section, with a hyperlink to the relevant plan

and the agreement regarding the individual award or grant. Id. at ¶33. Beneath each hyperlinked document was an instruction that the participant had to "read through the entire document before accepting," along with a check box indicating, "I have read and agree to the above document." Id. at ¶34. The participant could not click that checkbox unless he had opened the links to the documents. Id. Once he had opened the links to the documents and clicked that he had read them, the participant was required to enter a password as an electronic signature. Id. at ¶34-35. Only after the participant had done all these things could he accept or reject the award or grant. Id. at ¶36.

According to the defendant's awards and incentives manager, the plaintiff used StockPlan Connect (either the original version, or the modified version) to accept sixteen of the outstanding or unvested awards/grants. Id. at ¶¶8, 42.

D.    *The Defendant Recruited the Plaintiff for a New Position*

In January 2016, the defendant entered into an agreement to merge with Tyco International plc, an Irish public limited company. Dkt. No. 10-14. Around February of the same year, the defendant's leadership—including then-CEO Alex Molinaroli and Chief Human Resources Officer Simon Davis—started recruiting the plaintiff for the newly-formed, executive-level position of President of Asia Pacific (APAC). Dkt. No. 4 at ¶4. The APAC Presidency was unique; it had specific job duties, responsibilities and reporting requirements. Id. It was one of only a few positions that reported directly to the CEO. Id.

The defendant's leadership prepared several documents outlining the APAC Presidency position, including a RASIC Chart[1] and a Position Brief, which detailed the specific duties, responsibilities and goals for the position. Dkt. Nos. 12-1, 12-2. The Position Brief specifically described the APAC Presidency position as

> [A] critical leadership role responsible for strategic business growth, enterprise leadership and functional management for JCI in the region. As a member of the Executive Operating Team (EOT) this individual will ultimately define and deliver the strategic roadmap for APAC driving fast paced growth and market leadership for all of JCI's businesses. President—Asia Pacific will collaborate with the Business Unit (BU) leadership in the region to target and achieve both organic and inorganic growth across all market segments. This role will have direct responsibility for managing APAC based corporate and functional leadership resources.

Dkt. No. 12-2 at 2.

The Position Brief also explained that the President of APAC would be responsible for strategic planning and overseeing all the defendant's then-existing business units in the APAC region; developing and supervising APAC strategic planning, corporate development and government relationships; and developing and overseeing all APAC corporate functions from the defendant's new Shanghai-based world headquarters. Id. at 1-2. According to the defendant's press release, the plaintiff would be responsible for managing "all of Johnson Controls' businesses across the Asia Pacific region." Dkt. No. 12-3 at 1.

---

[1] "RASIC" stands for "**R**esponsible, **A**ccountable, **S**upport, **I**nform, **C**onsult." Dkt. No. 12-1 at 2.

As part of the recruitment process, the defendant provided the plaintiff with a Global Assignment Letter—really, an offer letter. Dkt. No. 12-4. The Global Assignment Letter laid out the specifics of the compensation and allowance package set up for the plaintiff in the new position of APAC President. Id. at 1. It listed the base salary, bonus, relocation allowance, host housing, furniture allowance, vacations and holidays, tax equalization, retirement and many other benefits of the position. Id. at 2-6. The Global Assignment Letter stated that it "should be read in conjunction with the Employment Agreement," and that the Global Assignment Letter controlled if there was a conflict between the terms of the letter and the terms of the Employment Agreement. Id. at 1. The Global Assignment Letter stated that the plaintiff's assignment as President of APAC would last two years, starting April 1, 2016. Id. It listed the "host location" as "Shanghai, China." Id.

The last paragraph of the Global Assignment Letter reads as follows:

**Disputes About this Letter**

The parties agree that all disputes regarding this assignment letter or interpretation of the letter shall be governed by the laws of the State of Wisconsin and the parties further agree that the exclusive forum for resolving all such disputes shall be the courts of the State of Wisconsin.

Id. at 7. Below this paragraph are the words, "Accepted by:," followed by a signature line with the plaintiff's name typed beneath it. The plaintiff's signature appears above that line; the date to the right of the signature is March 4, 2016. Id. Below the plaintiff's signature, the words, "Approved by:"

appear; Vice President and CHRO Simon Davis and Chairman and CEO Alex Molinaroli signed in that space. Id.

The board of directors approved the plaintiff's promotion to the APAC Presidency at its meeting on March 16, 2016. Dkt. No. 12-10. CEO Molinaroli advised the plaintiff of the board's approval in a March 17, 2016 inter-office correspondence memo that reiterated the plaintiff's executive compensation package, including stock options. Id.

The record includes a March 31, 2016 letter addressed to the plaintiff ("The Letter Agreement"). Dkt. No. 10-15. The Letter Agreement provided:

> Although the Merger does not constitute a "Change of Control" within the meaning of that certain Change of Control Executive Employment Agreement, dated as of July 28, 2010[2] (the "COC Employment Agreement"), by and between the Company and you, the Company intends to activate certain of the provisions of the COC Employment Agreement in connection with the Merger as described in further detail in this letter agreement ("the Letter Agreement").

Id. at 1. Somewhat paradoxically, the Letter Agreement also stated:

> Notwithstanding the definition of Change of Control in the COC Employment Agreement, for the purposes of the COC Employment Agreement, the Merger shall be deemed to constitute a Change of Control and you shall be entitled to the rights and remedies, and have the obligations, set forth in the COC Employment Agreement as though a Change of Control occurred as of the Effective Time . . .

Id. Paragraph 5(b) of the Letter Agreement provided that "[t]his Agreement shall be governed by the laws of the State of Wisconsin, without reference to conflict of law principles thereof." Id. at 3. The last sentence of the Letter Agreement

---

[2] Neither party provided the court with a July 28, 2010 Change of Control Executive Employment Agreement.

instructed, "Please confirm your agreement to all of the foregoing by executing this Letter Agreement as indicated below." Id. at 4. It is signed—oddly—"Very truly yours, JOHNSON CONTROLS, INC.," followed by the word "By:," with a signature line for the plaintiff (and the title "VP & President, Asia Pacific). Id. Below are the words, "Acknowledged and Agreed:," and Alex Molinaroli's signature appears above his typed name and the title "CEO & Chairman of the Board." Id.

E.  *The Change of Control Agreement*

The plaintiff attached to the complaint a document entitled "Johnson Controls, Inc. Change of Control Executive Employment Agreement." Dkt. No. 1-1. The first sentence of this documents says that it is an agreement between the defendant and the plaintiff "dated April 1, 2016." Id. at 1. (At this point, while the defendant had agreed to merge with Tyco, the merger was not complete.) The prefatory paragraph explains the purpose of the agreement:

> The Board of Directors of the Company (the "Board") has determined that it is in the best interests of the Company and its shareholders to assure that the Company will have the continued dedication of the Executive, notwithstanding the possibility, threat or occurrence of a Change in Control (as defined below) of the Company. The Board believes it is imperative to diminish the inevitable distraction of the Executive by virtue of the personal uncertainties and risks created by a pending or threatened Change of Control and to encourage the Executive's full attention and dedication to the Company currently and in the event of any threatened or pending Change of Control, and to provide the Executive with compensation and benefits arrangements upon a Change of Control which ensure that the compensation and benefits expectations of the Executive will be satisfied and which are competitive with those of other corporations. Therefore, in order to accomplish these objectives, the Board has caused the Company to enter into this Agreement.

Id.

After defining the phrase "change in control," the agreement explains what executive benefits it protects, and for how long. Id. at 4-7. It explains the conditions under which the defendant could terminate the executive's employment. Id. at 7-8. Relevant to the plaintiff's claim, the agreement states that the *executive* may terminate his employment with the defendant "for Good Reason," and then it provides six circumstances that constitute "Good Reason." Id. at 8. One of these circumstances is "the assignment of the Executive of any duties inconsistent in any respect with the Executive's position . . . authority, duties or responsibilities, . . . or any other action by the Company which results in a diminution in such position, authority, duties or responsibilities . . . ." Id. The agreement goes on to provide that the executive would be entitled to certain payments and benefits if the defendant terminated him in violation of the agreement, or if the executive resigned for "Good Reason." Id. at 9-15.

Toward the end of the document, there is a "Miscellaneous" provision that states, "This Agreement shall be governed by and construed in accordance with the laws of the State of Wisconsin, without reference to principles of conflict of laws." Id. at 16. It repeats this provision in paragraph 11(g), on the last page. Id. at 18. Although the last page contains signature lines for the plaintiff and CEO Alex Molinaroli, the version the plaintiff attached to the complaint is unsigned. Id.

The plaintiff asserts that he was "one of only a few JCI employees who received a COC agreement." Dkt. No. 12 at ¶11.

F.    *The Plaintiff Resigns*

The plaintiff indicates that from April 2016 through September 2016, he worked for the defendant in the defendant's world headquarters in Shanghai; he asserts that he devoted "100%" of his time, or "roughly 60-70 hours a week," to the position. Dkt. No. 12 at ¶12. His wife and children joined him in China for about six months, but moved back to Wisconsin while he continued to work in Shanghai. Id. at ¶2.

The company that resulted from the merger, defendant JCI, began operations on September 6, 2016. https://www.johnsoncontrols.com/media-center/news/press-releases/2016/09/06/johnson-controls-and-tyco-complete-merger. The plaintiff alleges that after the merger, the defendant "immediately" changed his position—"diminished [his] duties, responsibilities, and authority, and changed [his] reporting requirements," dkt. no. 12 at ¶13; he asserts that the defendant also changed his position, id. at ¶14. The plaintiff says that, based on the changes the defendant made in his duties, responsibilities, role and position, he "came to a 'good faith' belief that [he] had 'Good Reason' to terminate" that position under the COC Agreement. Id. at ¶21. He provided his formal resignation letter on April 22, 2018 and asked for information about how to collect the termination amount he was owed under the COC. Id. at ¶22. The plaintiff avers that as of the date of his resignation, he was entitled to over $5.5 million dollars under the agreement. Id. at ¶11. The defendant responded that it did not believe that the plaintiff had terminated his

employment for "Good Reason," and refused to pay the termination amount. Id. at ¶¶24, 26.

G.    *The Plaintiff Files This Suit*

The defendant indicated in the motion to stay or dismiss that shortly after the plaintiff resigned, he provided the defendant with a demand letter. Dkt. No. 10 at 16. The defendant's counsel responded that "any dispute between [the plaintiff] and [the defendant] would require arbitration pursuant to the 2016 Plan, among others." Id.

About two weeks later, on June 27, 2018, the plaintiff filed this suit. Dkt. No. 1. The complaint alleges that the defendant breached the terms of the COC agreement by "failing to acknowledge that [he] terminated his employment for Good Reason and for failing to pay [him] the sums and benefits to which he is entitled under the Agreement." Id. at ¶77. He sought an order that his resignation was for "Good Cause" and that he was entitled to the benefits provided in the COC, as well as damages, fees and costs. Id. at pp. 15-16.

## II.    Defendant's Motion to Stay or Motion to Dismiss, Dkt. No. 9

The defendant argues that if it demonstrates there was an agreement to arbitrate, this court must grant its request stay or dismiss. Dkt. No. 10 at 17. It argues that the master plans are governed by the Federal Arbitration Act, id. at 17-19, and that the court should look to Wisconsin law to decide whether the parties agreed to arbitrate, Id. at 20-21. The defendant asserts that on at least seventeen occasions, when he accepted awards or grants, the plaintiff agreed to arbitration. Id. at 22. The defendant asserts that it follows that it is

up to the arbitrator to decide whether the plaintiff's claim that the defendant violated the COC agreement falls within the arbitration provisions of the master and individual awards plans. Id. at 27-28. It also asserts that even if this court were the correct entity to decide that question, the dispute clearly falls within the scope of the arbitration provisions. Id. at 28-30. Finally, the defendant argues that even if the court concludes that some part of the plaintiff's claim is not subject to the arbitration agreements, the court should refer the parts that *are* subject to arbitration to the arbitrator first, before deciding any non-arbitrable claims itself. Id. at 30-32.

The plaintiff counters that his single claim is whether he had "Good Reason" to terminate his employment with the defendant; if so, he is entitled to the termination benefits promised in the COC Agreement and the defendant is in breach by failing to pay those benefits. Dkt. No. 11 at 1. He asserts that "the dispute resolution provision applicable to the COC Agreement mandates that '***the exclusive judicial forum for resolving all disputes shall be the courts of the State of Wisconsin***.'"[3] Id. at 2. He asserts that the COC Agreement governs the dispute, and that because it does not mandate arbitration, this court should deny the defendant's motion. Id. He also asserts that he never agreed to arbitration under the COC Agreement. Id. He argues that the awards plans each contained a provision saying that those plans did not apply "in the

_____

[3] The plaintiff cites the source of this italicized, bold-faced quote as "Declaration of Trent Nevill ("Nevill Decl."), Ex. D. p. 6." Dkt. No. 11 at 2. Exhibit D to the plaintiff's declaration is located at Dkt. No. 12-4; it is the Global Assignment Letter, not the COC Agreement.

event an employee possesses a change of control agreement or other similar employee agreement." Id. at 13. He says that the COC Agreement (and the Global Assignment Letter) "supersede" the award plans. Id. at 21-22. He also claims that the Wisconsin Arbitration Act prohibits arbitration of employment disputes, and thus that even if the awards plans did govern this dispute, they are void and unenforceable. Id. at 23-24. He states that the fact that the awards plans "hid" the arbitration provisions in hyperlinks and "piggy-backed" them onto already existing benefits, the provisions were void. Id. at 25-26. He asserts that the arbitration provisions were "one-sided," and unfair. Id. at 26-27. And he concludes by stating that the defendant's insistence that an arbitrator decide any arbitrable issues first puts the cart before the horse. Id. at 28-29.

The defendant replies that the choice-of-law provisions do not override the arbitration clauses. Dkt. No. 13 at 7-8. It asserts that the Federal Arbitration Act preempts the Wisconsin Arbitration Act's prohibition on arbitrating employment disputes. Id. at 10-11. It points out that the plaintiff has not disputed that he agreed to arbitration when he accepted the various awards over the years. Id. at 11-12. It asserts that the COC Agreement did not void the awards plans. Id. at 12-16. It reiterates that it is the arbitrator's role to decide the scope and enforceability of the arbitration clauses. Id. at 11-15.[4]

---

[4] The plaintiff sought leave to file a sur-reply, dkt. no. 14, and the court granted that request, dkt. no. 15. The issues discussed in the sur-reply are somewhat tangential to the question at issue.

## III.    STANDARD OF REVIEW

The defendant first asked the court to stay proceedings in this court pending the outcome of arbitration. The standard governing a motion to stay pending arbitration comes from the statutory language of Section 3 of the Federal Arbitration Act. If a party brings a suit in federal court on any issue "referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. §3.

In the alternative, the defendant asked the court to dismiss the case under Fed. R. Civ. P. 12(b)(3). That rule allows a party to move to dismiss a case for improper venue. When ruling on a Rule 12(b)(3) motion to dismiss for improper venue, the court may consider facts outside the complaint. Faulkenberg v. CB Tax Franchise Sys., LP, 637 F.3d 801, 809-10 (7th Cir. 2011) ("on a motion to dismiss for improper venue, the district court is not 'obligated to limit its consideration to the pleadings [or to] convert the motion to one for summary judgment' if the parties submit evidence outside the pleadings.") (quoting Cont'l Cas. Co. v. Am. Nat'l Ins. Co., 417 F.3d 727, 733 (7th Cir. 2005)).

## IV.  Analysis

Title 9, Section 2 of the United States Code provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. §2. The Supreme Court describes this statute as "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "Once it is clear . . . that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." Gore v. Alltel Communications, LLC, 666 F.3d 1027, 1032 (7th Cir. 2012). "'To this end, a court may not deny a party's request to arbitrate an issue "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."'" Id. (citing Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 909 (7th Cir. 1999)).

The first question a court must answer, then, is whether "the parties have a contract that provides for arbitration of some issues between them." Id. If there is no contract between the plaintiff and the defendant that provides for arbitration, section 2 of the FAA does not apply and there is no reason for this court to stay or dismiss the proceedings before it.

18

A. *Is there a contract between the parties that provides for arbitration?*

The defense asserts that there are several contracts that provide for arbitration—the 2012 and 2016 Plans, and the agreements applicable to individual awards and grants, which incorporated those plans.

There is no dispute that the 2012 Plan says that if anyone (other than the defendant) brings a claim involving the defendant or an affiliate of the defendant, "regardless of the basis of the claim (including but not limited to claims relating to wrongful discharge, Title VII discrimination, the Participant's employment or serve with the [defendant] or its Affiliates or the termination thereof, benefits under this Plan or other matters)," that claim "shall be settled" by arbitration. Dkt. No. 10-3 at ¶19(h). Nor is there a dispute that the 2016 Plan says that "with respect to Awards granted on or after the Amendment Effective Date," if anyone other than the defendant brings a claim involving the defendant or one of its subsidiaries, "regardless of the basis of the claim (including but not limited to claims relating to wrongful discharge, Title VII discrimination, the Participant's employment or service with the [defendant] or its Subsidiaries or the termination thereof, benefits under this Plan or other matters)," that claim "shall be settled" by arbitration. Dkt. No. 10-4 at ¶7.16.

The question is whether these plans constitute contracts between the plaintiff and the defendant. To answer that question, "federal courts apply state-law principles of contract formation." Gore, 666 F.3d at 1032 (citing Rosenblum v. Travelbyus.com, Ltd., 299 F.3d 657, 662 (7th Cir. 2002)). In this case, the court looks to Wisconsin law to determine whether the plans

constitute contracts between the parties. The one thing about which the parties agree is that all the arguably relevant documents—the 2012 and 2016 plans, the individual award agreements, the Global Assignment Letter, the COC Agreement—state that Wisconsin law governs any disputes.

"Under Wisconsin law, an enforceable contract has three elements: offer, acceptance, and consideration." C.G. Schmidt, Inc. v. Permasteelisa North America, 825 F.3d 801, 805 (7th Cir. 2016) (citing Runzheimer Int'l, Ltd. v. Friedlen, 862 N.W.2d 879, 885 (Wis. 2015)).

1. Offer

Under Wisconsin law,

> [a]n offer is a communication by a party of what it will give or do in return for some act by another. *In re Lube's Estate,* 225 Wis. 365, 368, 274 N.W.276, 278 (Wis. 1937). It must look to the future and "'be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain.'" *Farnsworth, McKoane & Co. v. North Shore Sav. & Loan Ass'n,* 504 F. Supp. 673, 676 (E.D. Wis. 1981) (quoting *Goebel v. National Exchangors, Inc.,* 88 Wis.2d 596, 615, 277 N.W.2d 755 (1979)). No particular form of communication is required—an offer may be made in writing, orally or implied in fact from the conduct of the parties and other circumstantial evidence. *Goetz v. State Farm Mut. Auto. Ins. Co.,* 31 Wis.2d 267, 272, 142 N.W.2d 651, 657-58 (Wis. 1966); *see also Theuerkauf v. Sutton,* 102 Wis.2d 176, 184-85, 306 N.W.2d 651, 657-58 (Wis. 1981) (contract implied in fact arises from agreement circumstantially proved and requires showing that there was a request to perform services of value); *Household Utils., Inc. v. Andrews Co.,* 71 WIs.2d 17, 29, 236 N.W.2d 663, 669 (Wis. 1976) (intent of parties "derived from consideration of their words, written and oral, and their actions").

Carroll v. Stryker Corp., 670 F. Supp. 2d 891, 898 (W.D. Wis. 2009)

On multiple occasions over the eighteen years prior to the plaintiff's resignation, the defendant notified the plaintiff that it was offering him a grant or an award. It notified the plaintiff of these offers via email, indicating that he had been "awarded" a grant or an award; that email advised him that he would be receiving instructions on how to accept that award. <u>See</u> Dkt. No. 10-6, 10-9. In the case of awards offered under the 2016 plan, the email notified the plaintiff that he could review the terms of the award, "including the Omnibus Plan which governs the award," by signing on to his StockConnect account. Dkt. No. 10-9 at 2. Each time, the defendant informed the plaintiff in either the introductory email or the follow-up email that he could accept the grant or award through either the Benefit Access or the StockPlan Connect system. Each time the defendant offered the plaintiff a grant or an award, it notified him, via email, that he needed to "[r]eview the terms of the grant, including all documents pertaining to the grant" and "[i]ndicate that you accept the terms . . . ," dkt. no. 10-1 at ¶19 or "[r]eview the agreements for each award and check the boxes to acknowledge you have read and agree to the terms of the award," dkt. no. 10-1 at ¶30. Each time the plaintiff logged into the systems to accept an award, he had to click the buttons that opened the governing plan and other governing documents, then click an acknowledgment that he had read, and agreed to, the documents.

The court concludes that these communications from the defendant to the plaintiff constituted offers for the purposes of contract formation under Wisconsin law. The defendant communicated to the plaintiff that it was going

to give him something—a grant or an award. The emails were phrased in the present perfect tense—they notified the plaintiff that he "has received" the grant or award—implying that the offer was on-going into the future. They were definite in their terms—in order to accept the grant of offer, the plaintiff would have to follow the steps, including reviewing the terms and accepting them. Both the communications, and the electronic system that prohibited the plaintiff from accepting the award until he indicated that he had reviewed and agreed to the governing documents, implied that unless the plaintiff reviewed and agreed to the governing documents, the defendant would not give him the award. These communications were offers.

2.     Acceptance

Wisconsin law provides that

> [a]cceptance of an offer requires "a meeting of the minds, a factual condition that can be demonstrated by word or deed." *Ziege Distributing Co., Inc. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995) (citing *Household Utils.*, 71 Wis.2d at 29, 236 N.W.2d at 669). Like an offer, an acceptance can be communicated in writing, orally or implied from the parties['] conduct. *Morris F. Fox & Co. v. Lisman*, 208 Wis.2d 1, 240 N.W. 809, 811 (Wis. 1932).

Carroll, 670 F. Supp. 2d at 898.

The plaintiff does not appear to dispute that on multiple occasions, he clicked the various buttons that opened the governing plans and documents, or that he clicked the buttons indicating that he agreed to those plans and documents, or that he accepted the grants and awards the defendant offered. Instead, he argues that the arbitration clauses in the plans were unconscionable. Dkt. No. 11 at 25-27. He argues that the provisions violated

the Wisconsin Arbitration Act, that the provisions were "hidden in a hyperlink and piggy-backed onto benefits and compensation its employees were already entitled to receive," that they were "one-sided" in favor of the defendant, that they were not clearly called out in the plan, and that they were unfair (calling for a single arbitrator, making the employee responsible for his or her attorneys' fees, allowing only the defendant to select the location of the arbitration and requiring the proceedings to be confidential). Id.

For a contract provision to be declared invalid as unconscionable, the contract or contract provision must be determined to be both procedurally and substantively unconscionable. Wisc. Auto Title Loans, Inc. v. Jones, 290 Wis. 2d 514, 532 (Wis. 2006). The court makes that determination on a case-by-case basis. Id. at 533. "Procedural unconscionability requires consideration of the factors bearing on a meeting of the minds, while substantive unconscionability 'pertains to the reasonableness of the contract terms themselves.'" Deminsky v. Arlington Plastics Machinery, 259 Wis. 2d 587, 609 (2003). The factors a court considers in deciding whether a contract provision is procedurally unconscionability "include, but are not limited to, age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract." Wis. Auto Title Loans, 290 Wis. 2d at 534-535. "Substantive unconscionability addresses the fairness and reasonableness

23

of the contract provision subject to challenge." Id. at 535. "To tip the scales in favor of unconscionability requires a certain quantum of procedural plus a certain quantum of substantive unconscionability." Deminsky, 259 Wis. 2d at 609.

As to procedural unconscionability, the plaintiff was a high-level executive, having worked his way up the corporate ladder over twenty-two years. He is, and was at the time he accepted the grants and awards, an intelligent, educated adult with extensive business acumen and experience. He had bargaining power—while he had to accept the terms of the plans and the individual agreements in order to obtain the benefits of the grants and awards, he could have rejected the terms by rejecting the awards. Although the defendant drafted the plans and the individual award agreements, the terms of the arbitration provision were clear and there were no alterations to those terms (other than changing the word "Affiliates" in the 2012 version of the Plan to the word "Subsidiary" in the 2016 version of the Plan). Neither party has pointed to alternative providers of the subject matter of the plans and individual award agreements.

Because a contract provision must be both procedurally and substantively unconscionable for a court to invalidate it, and because there is no evidence of procedural unconscionability, the court could stop its analysis of the plaintiff's argument here. But the court notes that his substantive unconscionability arguments are not persuasive. While the arbitration provisions call for a single arbitrator, Dkt. No. 10-3 at ¶19(h)(iii) (2012 Plan);

Dkt. No. 10-4 at ¶7.16(c) (2016 Plan), that is true of many valid arbitration provisions. While the provisions require the plaintiff to pay his attorneys' fees, they also require the defendant to shoulder "its own costs, the AAA filing fee and all other fees, costs, and expenses of the arbitrator and AAA for administering the arbitration." Dkt. No. 10-3 at ¶19(h)(iv) (2012 Plan); Dkt. No. 10-4 at ¶7.16(d) (2016 Plan). The provisions state that the defendant gets to select the location of the arbitration, Dkt. No. 10-3 at ¶19(h)(v) (2012 Plan); Dkt. No. 1-4 at ¶7.16(e) (2016 Plan), and the plaintiff expresses concern that the defendant might select its "inconveniently located new hometown of Cork, Ireland," dkt. no. 11 at 27. Defense counsel dismissed this suggestion out-of-hand at oral argument, but the court acknowledges that this does not mean the defendant might not select a location for the arbitration that is less convenient for the plaintiff than 517 East Wisconsin Avenue in Milwaukee, where this court is located and a few minutes' drive from plaintiff's counsel's office. That fact does not render the provisions unconscionable, nor does the fact that the existence, outcome and results of the arbitration would be confidential. Many settlements reached in court proceedings are confidential by agreement of the parties; often parties resolve disputes before this court and do not share the terms of the resolution with the court (despite its having invested significant time in the litigation).

Nothing in the arbitration clauses would prevent an arbitrator from finding that the plaintiff resigned for "Good Reason," and that the defendant owes the plaintiff the termination benefits specified in the COC Agreement.

The court concludes that the plaintiff accepted the defendant's award offers, and that he did not accept an unconscionable condition.

### 3. Consideration

Under Wisconsin law,

> [t]he third element of a valid contract is consideration, which is evidence of the parties' intent to be bound to the contract, *McLellan [v. Charley],* 313 Wis. 2d [623] at 645-46, 758 N.W. 2d [94] at 105 [(Wis. Ct. App. 2008)] (citing *Gustafson [v. Physicians Insurance Co.,]* 223 Wis.2d [164] at 173, 588 N.W.2d [363] at 367 [Ct. App. 1998)], and consists of a benefit to the promisor or a detriment to the promisee, *Beaver v. Mueller,* 263 Wis.2d 431, 662 N.W.2d 678 (Table) (Wis. Ct. App. 2003) (citing *First Wis. Nat'l Bank v. Oby*, 52 Wis.2d 1, 188 N.W.2d 454 (Wis. 1971)). In order for mutual promises to furnish consideration for each other and thus create a binding contract, they must impose some legal liability on the persons making them. *Id.* There is no consideration where performance is solely at the party's option or discretion, such as when the party is free to either perform or withdraw from the contract at will. *Id.*

Carroll, 670 F. Supp. 2d at 899.

The benefit to the promisor—the defendant—was that it obtained the plaintiff's agreement to resolve any disputes about his employment through arbitration. As evidenced by the plaintiff's vigorous objection to arbitrating this dispute, that was a detriment to the plaintiff—the promisee. The benefit to the plaintiff/promisee was that he would receive a grant or award. The grant or award came out of the defendant's coffers, and thus was a detriment to the defendant/promisor. The parties made mutual promises to furnish each other with consideration. Performance was not solely at the discretion of one party or the other—if the plaintiff read and accepted the terms of the plans, the

defendant was required to give him the offered grant or award. If the plaintiff wanted to accept the offered award, he had to accept the terms of the plans.

Despite this, the plaintiff argues that he "did not agree to arbitrate claims under his COC Agreement." Dkt. No. 11 at 20. He says that he "never agreed to submit any issues arising from his COC Agreement to arbitration, nor would he have." Id. (citing Dkt. No. 12 at ¶28[5]). He argues that the COC Agreement superseded the award plans and points the court to language in the plans which, according to him, says as much.

The 2012 Plan contains the following provision:

> If the Participant has in effect an employment, retention, *change of control*, severance or similar agreement with the Company or any Affiliate that discusses the effect of a Change of Control on the Participant's Awards, then such agreement shall control.

Dkt. No. 10-3 at ¶18(c) (emphasis added). The 2016 Plan contains a similar provision:

> For Awards granted on or after the Amendment Effective Date, I the Participant has in effect an employment, retention, *change of control*, severance or similar agreement with the Company or any Subsidiary that discusses the effect of a Change in Control on the Participant's Awards, then such agreement shall control.

Dkt. No. 10-4 at ¶5.4(b).

The plaintiff argues that even if the arbitration provisions in the plans might otherwise apply, the above language evidences the defendant's intent to "include language giving its executives' COC Agreements superior status." Dkt.

---

[5] The plaintiff actually cites to paragraph 29 of his declaration, but the paragraph in which he asserts that he did not agree to arbitration of the COC Agreement and would not have is paragraph 28.

No. 11 at 22.  He asserts that these are "express" clauses "stating that the plans do not apply in the event an employee possess a change of control agreement or other similar employee agreement." Id. at 13. The court disagrees.

First, as the court indicated above, the plaintiff attached to the complaint a copy of the COC Agreement, but it doesn't contain his signature, or then-CEO Molinaroli's signature. The court does not know when, or if, the parties executed the COC Agreement (although it can infer that if the parties hadn't executed the agreement, the defendant would have been quick to point that out).

Assuming the plaintiff "had in effect a change of control agreement," the next question is whether that agreement "discuss[ed] the effect of a Change of Control on the Participant's Awards." The COC Agreement the plaintiff attached to the complaint does discuss the effect of a Change of Control on awards. Paragraph 5(iii) of the COC Agreement says the following:

> If, during the Employment Period, the Executive's Termination of Employment shall be by Company other than for Cause or Disability or by the Executive for Good Reason, then, subject to the provisions of Section 8:
>
> iii.     to the extent not theretofore paid or provided, the Company shall timely pay or provide to the Executive any other amounts or benefits required to be paid or provided on which the Executive is eligible to receive pursuant to this Agreement under any plan, program, policy or practice or contract or agreement of the Company and its Affiliated Companies . . . .

Dkt. No. 1-1 at ¶5(iii).

Even accepting the plaintiff's reading of the plan language and assuming that the language of the COC Agreement controls grants and awards, the above

language from the COC Agreement does nothing more than say that if the plaintiff resigned for "Good Reason," the defendant will pay him whatever grants or awards (or other benefits) he would have been entitled to under the plans. The court does not see how one could read this language as abrogating the arbitration provisions of the plans.

Nor can the court find any other language in the COC Agreement that one could read to abrogate, or supersede, the arbitration provisions in the plans. Unlike the plans, the COC Agreement does not contain a provision governing dispute resolution. It does not say that disputes about the COC Agreement must be resolved in a court, nor does it say such disputes must be resolved by arbitration. It is silent on the question. It *does* contain two choice-of-law provision, both stating that the agreement is governed by Wisconsin law, without reference to conflict of law principles thereof." Dkt. No. 1-1 at ¶¶11(a), 11(g). The plans contain that same choice-of-law provision; there is no conflict between them.

The plaintiff argues that while the COC Agreement itself makes no mention of dispute resolution, the Global Assignment Letter does, and that it should be "read in conjunction" with the COC Agreement. Dkt. No. 11 at 19. The Global Assignment Letter *does* contain a dispute resolution provision. That provision says that "all disputes *regarding this assignment letter or interpretation of the letter*" will be governed by Wisconsin law, and that the "exclusive judicial forum for resolving all such disputes shall be the courts of the State of Wisconsin." Dkt. No. 12-4 at 7 (emphasis added). The letter

specifically confines the dispute resolution provision to "Disputes About This Letter;" that is the title of the dispute resolution section. The letter is, as the court noted in the fact section, a job offer. The defendant offers the plaintiff certain wages and benefits—a particular "compensation and allowance package." Id. at 1-6. If the plaintiff was disputing that the base salary the defendant offered him on page 1 of the letter, the dispute resolution provision on page 7 requires that that dispute be governed by Wisconsin law, and that the "exclusive judicial forum" for resolving that dispute would be a court of the State of Wisconsin. If the plaintiff was disputing the 15% hardship allowance the defendant offered him at page 3 of the letter, the dispute resolution provision on page 7 requires that the dispute be governed by Wisconsin law, and that the "exclusive judicial forum" for resolving that dispute would be a court of the State of Wisconsin.

Even reading the Global Assignment Letter "in conjunction with" the COC Agreement, as the plaintiff urges the court to do, the dispute resolution provision of the letter does not govern disputes over the *COC Agreement*. It governs only disputes about the job offer the defendant made to the plaintiff in the Global Assignment Letter. The plaintiff's statement that the letter "governs all claims Mr. Nevill may have under his COC Agreement and related compensation and benefits" simply is not accurate. Dkt. No. 11 at 19. Nor is

his statement that the Global Assignment Letter "ends the conversation."[6] Id. at 20.

The complaint alleges that the defendant "has breached the terms of the Change of Control Agreement." Dkt. No. 1 at ¶77. It asks for damages and other relief under the terms of the COC Agreement. Id. at ¶¶80-82. The plaintiff asserted in his opposition brief that his "COC Agreement is the be-all-end-all of the parties' current dispute." Dkt. No. 11 at 16. He accuses the defendant of trying to divert the court's attention from the COC Agreement. Id. The court agrees that this lawsuit is about whether the plaintiff's resignation was for "Good Reason" under the COC Agreement, and about whether the defendant owes him a termination payment and other benefits under that agreement. But the COC Agreement does not contain a dispute resolution agreement, and it does not supersede or render inapplicable the 2012 and 2016 Plans.

The plaintiff asks the court to read the language in the plans regarding changes in control to say that if the plaintiff has a change of control agreement, he is no longer bound by *any* of the provisions of the plans; he says that the plans "do not apply" if an employee has a change of control agreement. Not only is that reading too broad, but the court suspects that the plaintiff has not considered the broader implications of the argument.

---

[6] The plaintiff's full sentence says, "Though Mr. Nevill's Assignment Letter ends the conversation, his COC Agreement is also worth discussing." Dkt. No. 11 at 20. This off-handed reference to the COC Agreement being "worth discussing" stands in stark contrast to his insistence that it is the COC Agreement that governs the entirety of the dispute.

The plan language regarding changes of control is not as broad as the plaintiff argues. In the 2012 Plan, the provisions regarding changes in control are in paragraph 18, titled "**Adjustment Provisions; Change in Control**." Dkt. No. 10-3 at ¶18. Paragraph 18 discusses how company shares are affected by mergers or "other transaction[s] in which the Shares are" changed or exchanged or divided, or in which the company issues dividends, or in which shares lose status. It talks about how mergers, acquisitions, consolidations or reorganizations could impact issuance of awards under the Plan, or assumptions of awards. It discusses how, in the event of a merger or consolidation or reorganization, the company will treat stock awards or grants for employees who do not have change-of-control agreements. Everything in paragraph 18 has to do with how a change in company structure will impact the company shares a participant may be awarded under the plan. Nothing in paragraph 18 discusses how disputes under the plan will be resolved, or governing law. The provision providing that a change-in-control agreement "governs" is a sub-section of paragraph 18, discussing how changes in company structure impact shares.

The same is true for the 2016 Plan. In the 2016 Plan, the provisions regarding changes of control appear in Article VI, titled "SHARES SUBJECT TO THE PLAN; ADJUSTMENTS." Dkt. No. 10-4 at p. 19. Article V discusses the kinds of shares that an employee may be awarded under the Plan—it describes the shares, explains how to count them, explains what happens in the event of splits, reverse splits, dividends, mergers or other actions that could affect what

a "share" is and how it is valued. It discusses fractional shares. It discusses what happens to awards of shares when an employee dies or becomes disabled or is terminated. It is in this context that the Plan discusses what happens to shares when there is a change of control. The Plan's language about a change-of-control agreement governing is confined to the effect of that change of control on the participant's *shares*—the grants or awards.

In Wisconsin, courts construe "the meaning of contract provisions in the context of the entire contract as a whole." <u>AVL Powertrain Engineering, Inc. v. Fairbanks Morse Engine</u>, 178 F. Supp. 3d 765, 780 (W.D. Wis. 2016) (citing <u>Tempelis v. Aetna Cas. & Sur. Co.</u>, 169 Wis.3d 1, 9, 485 N.W.2d 217, 220 (1992)). "Words and phrases cannot be considered in isolation; rather, the court must consider the contract as a whole to provide each provision with the meaning intended by the parties." <u>First Bank & Trust v. Firstar Information Serv's Corp.</u>, 276 F.3d 317, 322 (7th Cir. 2001) (citing <u>Campion v. Montgomery Elevator Co.</u>, 493 N.W.2d 244, 249 (Wis. 1992)). To do as the plaintiff does, and read these sub-provisions as rendering the entire plan inapplicable where a participant has a change-of-control agreement, impermissibly disregards their context.

The plaintiff's reading also inures to his detriment. If, as the plaintiff argues, his COC Agreement rendered the Plans inapplicable, then even if he resigned for Good Reason, he would not be entitled to the seventeen outstanding and unvested awards. The COC Agreement says that if he resigns for Good Reason, the defendant will timely pay him amounts or benefits "under

33

any plan, program, policy or practice or contract or agreement of the Company and its Affiliated Companies . . . ." Dkt. No. 1-1 at ¶5(iii). If the plans, programs, policies or practices that offered the plaintiff these grants and awards no longer applied to him once he received the COC Agreement, then he is not entitled to any amounts of benefits under those plans under the COC Agreement. The court suspects the plaintiff did not mean to argue that *nothing* in the 2012 and 2016 Plans applies to him any longer.

The defendant pointed out one other fact in support of its argument that the arbitration provisions in the Plans require the court to grant its motion. The defendant directed the court to the March 31, 2016 letter addressed to the plaintiff, which reminded the plaintiff that the defendant had agreed to merge with Tyco (Dkt. No. 10-15). Dkt. No. 13 at 14. In that letter, the defendant advised the plaintiff that even though the merger didn't meet the definition of "change of control" laid out in a 2010 COC agreement between the plaintiff and the defendant, the defendant was going to "activate" some of the provisions of that 2010 COC agreement in connection with the Tyco merger. Dkt. No. 10-15 at 1. (Perhaps the defendant eventually thought better of this method of proceeding, given that it appears that it gave the plaintiff a new COC Agreement which purports to have been drafted the following day—April 1, 2016.) The defendant pointed out that paragraph 4 of that letter defendant said,

> The Company hereby agrees that, with respect to any equity awards held by you that are granted under the Johnson Controls, Inc. 2012 Omnibus Incentive Plan (the "Plan"), the reference to "twenty-four (24) months" in Section 18(c)(iii) of the Plan shall, solely with respect

to termination events occurring with 36 months following the Merger, be deemed to be "thirty-six (36) months."

Id. at 2, ¶4.

The defendant argues that the fact that it carved out one small provision of the 2012 Plan, and changed only that small provision in the context of the Tyco merger and its impact on any awards the plaintiff received under the Plan, demonstrates that the remainder of that Plan continued to apply. During the hearing on the motion, defense counsel told the court that if the parties had wanted to render the 2012 and 2016 plans inapplicable, they could have drafted broad language that would have done just that. They didn't. The language in the March 31, 2016 letter, which the plaintiff signed under the admonition, "Please confirm your agreement to all of the foregoing by executing this Letter Agreement as indicated below," constituted the parties' agreements to change only one small provision of the 2012 Plan, leaving the remainder of that Plan in effect.

### 4. Conclusion

The court concludes that there were offers, there was acceptance and there was consideration, which resulted in contracts between the plaintiff and the defendant. Those contracts "provide for arbitration of some issues between" the parties. Gore, 666 F.3d at 1032.

### B. *Are the Arbitration Clauses Susceptible of an Interpretation that Covers the Asserted Dispute?*

Once the court determines that there are contracts between the parties that provide for arbitration of some issue between them, Seventh Circuit law

and the FAA mandate that the court must grant the defendant's motion "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Gore, 666 F.3d at 1032-33 (quoting Kiefer Specialty Flooring, Inc., 174 F.3d at 909). The court cannot say with positive assurance that the arbitration clauses in the Plans are not susceptible of an interpretation that covers the plaintiff's allegation that the defendant has violated the terms of the COC Agreement.

The arbitration provisions are broad. They apply to any "individual" who brings a claim "involving the Company" or an affiliate (2012 Plan) or subsidiary (2016 Plan). They apply "regardless of the basis of the claim." They apply to claims involving "the Participant's employment or service with the company . . . or the termination thereof," and to "benefits under the Plan." The plaintiff's allegation that he resigned for "Good Reason" is a claim relating both to his employment and to the termination of his employment. His claim that the defendant has breached the terms of the COC Agreement is a claim involving his employment and his termination of that employment. The court cannot envision an interpretation of the arbitration provisions that would not cover this dispute.

The plaintiff argues, however, that the arbitration provisions of the plans are void, because the Wisconsin Arbitration Act prohibits arbitration of employment disputes. Dkt. No. 11 at 23. Section 788.01 of the Wisconsin Statutes does say that while arbitration clauses in contracts generally are enforceable, that mandate does not apply "to contracts between employers and

employees . . . ." But the Supreme Court has held that when Congress enacted the FAA, it "precluded States from singling out arbitration provisions for suspect status." <u>Doctor's Assoc., Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996). "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." <u>AT&T Mobility LLC v. Concepcion</u>, 563 U.S. 333, 341 (2011) (citing <u>Preston v. Ferrer</u>, 552 U.S. 346, 353 (2008)). Wisconsin law prohibits outright enforcing arbitration agreements in employment disputes, which means that it is "displaced by the FAA." <u>See</u> <u>Bache Halsey Stuart Shields, Inc. v. Moebius</u>, 531 F. Supp. 75, 75-76 (E.D. Wis. 1983) (rejecting plaintiff's argument that the arbitration provision was unenforceable because it violated §788.01); <u>Hankee v. Menard, Inc.</u>, No. 01-C-661-C, 2002 WL 32357167, at *4 (W.D. Wis. April 15, 2001) (rejecting plaintiff's claim that §788.01 invalidated arbitration provision on the ground that that statute "impose[ed] restrictions separate from its general contract law").

Because the court cannot say with positive assurance that the arbitration clauses in the plans are not susceptible of an interpretation that covers the plaintiff's dispute, the court "may not deny" the defendant's request to arbitrate. <u>Gore</u>, 666 F.3d at 1032.

C.    *Should the Court Stay Proceedings, or Dismiss the Case?*

The defendant asked the court to either stay proceedings (presumably under 9 U.S.C. §3) or dismiss them under Fed. R. Civ. P. 12(b)(3).

Section 3 of the FAA requires a federal court to "stay the trial of the action" until arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration" has taken place. Here, the issue referable to arbitration is the issue at the heart of the federal lawsuit—whether the defendant has violated the COC Agreement. If the court were to "stay" these federal court proceedings, it is not clear what would be left for the court to do once the arbitration has concluded.

Rule 12(b)(3) allows a court to dismiss if it is not the proper venue for resolving the dispute. The court has concluded that federal court is not the proper venue for resolving this dispute. The court will grant the defendant's alternative motion to dismiss under Rule 12(b)(3).

## V. CONCLUSION

The court **DENIES** the defendant's motion to stay. Dkt. No. 9.

The court **GRANTS** the defendant's motion to dismiss under Rule 12(b)(3) for improper venue. Dkt. No. 9.

Dated in Milwaukee, Wisconsin this 23rd day of January, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**